**Mohammad Reza YOUSSEFINIA and Fahime Asadamraji, Petitioners,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 85–4290.

United States Court of Appeals, Fifth Circuit.

March 14, 1986.

Harvey A. Schein, Eugene J. Flynn, Dallas, Tex., for petitioners.

Edwin Meese, III, Atty. Gen., U.S. Dept. of Justice, Washington, D.C., Robert L. Bombough, Allen W. Hausman, Donald A. Couvillon, Immigration Lit., Civ. Div., Washington, D.C., for respondent.

David H. Lambert, Dist. Director, I.N.S., New Orleans, La., Ronald Chandler, Dist. Director, I.N.S., Dallas, Tex., for other interested parties.

Before WILLIAMS, HIGGINBOTHAM and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case comes before us on a petition for review of a denial of applications for asylum and suspension of deportation by the Immigration and Naturalization Service. Because we find that the immigration judge and the Board of Immigration Appeals did not abuse their discretion in determining that petitioners failed to establish either a well-founded fear of persecution or extreme hardship resulting from deportation, we uphold the INS determination.

### I

Petitioners Mohammad Reza Youssefinia and Fahime Asadamraji are natives and citizens of Iran. Youssefinia entered the United States in 1977 as a nonimmigrant

student, *see* 8 U.S.C. § 1101(a)(15)(F)(i), with authorization to remain until January 5, 1978 to attend an English language school in Irving, Texas.[1] His wife, Fahime Asadamraji, was admitted on April 29, 1978 as the alien spouse of a nonimmigrant student, with a status dependent upon her husband's. *See* 8 U.S.C. § 1101(a)(15)(F)(ii). Youssefinia's then ten-month old son Sepehr apparently entered the country with his mother; a daughter, Salieh Sally, was born in 1983 in Fort Worth, Texas.

Shortly after arriving in the United States, Youssefinia obtained authorization to attend Navarro College in Corsicana, Texas, and enrolled there for the summer and fall terms of 1977, and the spring term of 1978. In 1978 he began attending the University of Texas at Arlington, but the INS did not approve the transfer until February 1979. In fall 1979 Youssefinia enrolled at yet another school, Bishop College in Dallas, belatedly requesting permission to transfer schools in November 1979.

On November 24, 1979, the INS issued an order to show cause charging petitioners with deportability for Youssefinia's failure to obtain INS authorization before transferring to Bishop College. *See* 8 C.F.R. § 214.2(f)(4) (1983). On June 24, 1980, following a hearing before an immigration judge, petitioners were found deportable, and were given until July 9, 1980 to depart voluntarily. Petitioners reserved

the right to appeal after being advised of the ten-day filing period.

Petitioners did not appeal. Instead, Youssefinia filed an application for asylum, 8 U.S.C. § 1158, including his wife as a family member. The immigration judge treated the asylum application as a motion to reopen the deportation proceedings under 8 C.F.R. § 208.11 (1985), and granted the motion without objection from the INS to allow petitioners to present their case for asylum. Petitioners thereafter also filed an application for suspension of deportation, 8 U.S.C. § 1254, and a hearing to receive evidence on both applications was held November 28, 1984.[2]

Youssefinia testified at the hearing concerning his fear of persecution if he is forced to return to Iran. Evidence was presented that before coming to the United States Youssefinia, his sister, and an uncle were members of Rastakhiz, the political party of the former Shah of Iran, and that his father headed the party in the city of Abbassabad. Youssefinia testified that he was at one time a part-time informant in Abbassabad for Savak, the former Shah's secret police, that his father was a full-time informant for Savak, and that an uncle was the vice president of Savak in the city of Nooshahr. Youssefinia testified that the only person he ever reported in writing as an informant was a mullah who was posting anti-Shah posters in town. He testified that he also orally reported the activities of

---

1. On May 31, 1978, Youssefinia's nonimmigrant status was extended for the duration of his studies.

2. The delay between the original deportation proceedings and this 1984 hearing resulted from a *tessellation* of factors. Because there was no full-time immigration court in the Dallas district of the INS when Youssefinia filed his first application for asylum, it was not recognized as a motion to reopen the deportation proceedings, and was referred to the wrong department. In the meantime, an advisory opinion from the Bureau of Human Rights and Humanitarian Affairs of the State Department was solicited by the INS.

By the time the case surfaced there was a permanent immigration judge in Dallas, and he reopened the deportation hearings on August 3, 1982, but continued the hearing to allow peti-

tioners to obtain new counsel. Present counsel filed a new asylum application on September 17, 1982. In January 1983 the immigration court requested another advisory opinion from the BHRHA. In July 1983 a nonresponsive advisory opinion was received.

The hearing was next calendered for October 1983, at which time the immigration judge continued the hearing in order to request yet another advisory opinion on the asylum application from the BHRHA, which was received in February 1984. In October 1984, the hearing was reconvened and continued once again to allow counsel for petitioners to prepare an application for suspension of deportation, because by this time Youssefinia had been in the country continuously for seven years. The final hearing, as noted, was held in November 1984.

some people connected with the mullah, but admitted that no action was ever taken against either the mullah or his followers. Youssefinia testified he expected to be arrested upon returning to Iran because the mullah was not in a position of power. He testified further that his father, and the uncle and sister who were members of Rastakhiz, were arrested shortly after the revolution. The uncle and sister, though quickly released, were fired from their jobs; Youssefinia's father was jailed for three months, deprived of all social rights for three years, and his land and transportation company were allegedly taken from him. A warrant was allegedly issued for Youssefinia's arrest at the same time, but he was then in the United States. Youssefinia also testified that sometime later his father was arrested again and held for two weeks.

Youssefinia's testimony concerning the hardship that deportation to Iran would cause him and his family was less specific. This testimony focused primarily on the economic hardship the family was likely to suffer: Youssefinia claimed his prospects of obtaining employment in Iran were slim, that if jailed he would be unable to support his family, and that his assets may be confiscated when he tries to transfer them back to Iran. Youssefinia also testified that his family and especially his daughter, born in the United States and therefore a United States citizen, would suffer hardship because of the enormous cultural upheaval that has occurred in Iran since the revolution.

Following Youssefinia's testimony, the immigration judge denied Youssefinia's applications for asylum, withholding of deportation, and suspension of deportation. As to the asylum and withholding of deportation applications, the judge did not find credible Youssefinia's testimony that he would be permanently jailed or killed by the current regime for his activities in Iran or the United States, especially in light of the fact that his father, a member and full-time informer for Savak, was jailed for only three months following the revolution. Youssefinia's testimony that he could be jailed or persecuted on the basis of one letter that may have made its way into the Savak files where it might have been perused by the person about whom it was written, and then possibly identified with Youssefinia, was entirely too speculative, in the judge's view. Finally, the judge found that millions of Iranians were members of the former Shah's political party before the revolution, and that Youssefinia's position on return would be no worse than that of any other member of Iran's former westernized elite.

As to the application for suspension of deportation, the judge considered only hardship to Youssefinia and his daughter, since the other members of the family were neither permanent residents nor United States citizens. The judge found that the young daughter would have no more trouble adjusting to life in Iran than her brother had in adapting to life in the United States when he arrived. As to economic hardship, the judge found that Youssefinia had not demonstrated he would be unemployable in Iran considering his education, skills, and enterprise. While noting that the most serious claim of hardship was based upon the cultural changes which have occurred in Iran, the judge found that Youssefinia's preference for American culture over the conditions in his native country did not amount to the extreme hardship required by section 244 of the Immigration and Nationality Act, 8 U.S.C. § 1254.

Following the decision by the immigration judge, petitioners timely appealed to the Board of Immigration Appeals, which summarily affirmed the immigration judge's comprehensive findings. The case is now before us on a petition for review.

## II

Petitioners raise a number of issues. First, they argue they are not deportable because the regulation under which they were found deportable has been amended so that INS authorization before transferring schools is no longer necessary; at any rate, they argue, it was out of harmony

with statutory intent and hence void at the time of the original deportation hearings in 1980. Second, they argue that the immigration judge abused his discretion by not requesting an additional advisory opinion from the Bureau of Human Rights and Humanitarian Affairs after they submitted new evidence regarding their asylum application. Third, petitioners argue the immigration judge abused his discretion by applying the wrong standard in adjudicating their request for asylum. Finally, they argue that the immigration judge abused his discretion in determining that Youssefinia and his daughter would not be subject to extreme hardship if forced to return to Iran.

### A

 The immigration judge ordered petitioners deported based on the determination of the 1980 proceedings that Youssefinia had transferred schools without prior authorization from the INS, in violation of 8 C.F.R. § 214.2(f)(4) (1983).[3] In 1984 the regulation was amended to allow an alien student to transfer schools under certain circumstances and later notify the INS of the change. *See* 8 C.F.R. § 214.2(f)(8) (1985). Petitioners argue that their deportability should be measured under the regulation as amended, or alternatively, that the regulation prior to amendment did not conform with the statute it was promulgated under, 8 U.S.C. § 1101(a)(15)(F)(i). However, because petitioners did not appeal the issue of deportability following the 1980 deportation hearings, and because the hearings were reopened solely to consider the applications for asylum, withholding of deportation, and suspension of deportation, we are without jurisdiction to review the underlying issue of deportability.

Section 106(a) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a), confers exclusive jurisdiction on the United States Court of Appeals to review final orders of deportation made in administrative proceedings conducted under section 242(b) of the Act, 8 U.S.C. § 1252(b). *See generally Chen Fan Kwok v. INS*, 392 U.S. 206, 216, 88 S.Ct. 1970, 1976, 20 L.Ed.2d 1037 (1968). Section 106(c) of the Act expressly provides that "[a]n order of deportation ... shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations...." 8 U.S.C. §§ 1105a(c). Determinations in section 242(b) deportation proceedings are appealable to the Board of Immigration Appeals, 8 C.F.R. §§ 3.1(b)(2), 242.21 (1985), and the Board's decision is the final order of deportation which is reviewable by the courts of appeals under section 106(a). *Cf. Bae v. INS*, 706 F.2d 866, 869 (8th Cir.1983); *Bak v. INS*, 682 F.2d 441, 442 (3d Cir.1982).

Petitioners' deportability was established in the deportation hearings held in 1980. The immigration judge's opinion was issued on June 24, 1980, and petitioners were advised of the ten-day period for noting an appeal. Petitioners did not appeal, nor did they raise the issue of deportability in the reopened proceedings or in their appeal to the BIA of the denial of their applications for asylum and suspension of deportation. Because petitioners failed to exhaust their administrative remedies on the issue of deportability, we lack jurisdiction to consider it. *See Ka Fung Chan v. INS*, 634 F.2d 248, 258 (5th Cir.1981); *Hernandez v. INS*, 539 F.2d 384, 386 (5th Cir.1976); *Chung Young Chew v. Boyd*, 309 F.2d 857, 861 (9th Cir.1962).

---

**3.** (4) *School transfer.* A student shall not be eligible to transfer to another school unless he submits a valid Form I–20 completed by that school and the Service grants him permission to transfer.... Permission to transfer may be granted only if the applicant establishes that he is a bona fide nonimmigrant student, that he intends to take a full course of study at the

school to which he wishes to transfer, and that he in fact was a full-time student at the school which he was last authorized by the Service to attend, unless failure to commence or continue full-time attendance was due to circumstances beyond his control or was otherwise justified....

Petitioners concede they never appealed the finding of deportability nor expressly raised it as an issue in the reopened proceedings, but argue that their application for asylum was treated by the immigration judge as a motion to reopen the entire 1980 deportation proceedings, placing the validity of the underlying deportation order at issue before both the immigration judge and the BIA. They conclude that there was no need for any party to independently raise the issue, that they have exhausted their administrative remedies, and that we have jurisdiction over the issue of deportability. We must reject this argument, as it is unsupported by the record.

The immigration judge noted quite carefully on numerous occasions that he was not reopening the deportation hearings on all issues, but only so far as necessary to consider the various applications submitted by petitioners, none of which questioned the validity of the underlying deportation order. The August 3, 1982 hearing, in which the 1980 proceedings were first reopened, contained the following exchange:

> [The court]: Now, you filed an Application for Political Asylum in the United States which I am going to treat as a motion to re-open your Deportation Proceeding *to allow you to apply for Political Asylum before the Immigration Judge,* is that what you want to do?
> [Petitioners]: Yes, Sir. (by both)

(Emphasis added). In his November 28, 1984 oral decision, the judge again referred to the limited nature of the reopened hearing by stating that "I reopened the Hearing on August 3, 1982 *for the purpose of considering the request for Political Asylum* " (emphasis added). On several occasions the immigration judge referred to the proceedings as "the re-opened *section* of the [Deportation] Hearing" (emphasis added). In the October 3, 1984 hearing, the judge asked "if there are any alternative Applications that you wish to have considered should Asylum be denied," and in the November hearing prefaced the entry of the final order with the statement, "Since the respondent has made no other applications for relief, my only alternative is to enter the following order." Petitioners were thus not only invited to raise all issues throughout the hearings, but were put on notice that the proceedings were re-opened only so far as consideration of the applications for relief required. Because none of the applications involved a challenge to the underlying finding of deportability, that issue was not before either the immigration judge or the Board of Immigration Appeals, and we do not have jurisdiction to decide it.

**B**

At the October 3, 1984 hearing, petitioners submitted several exhibits in support of their asylum claim, which included an article from an Iranian newspaper attesting to the arrest and punishment of Youssefinia's father, a letter denying the application of Youssefinia's father to reopen his transportation company, and affidavits testifying that petitioners would be persecuted if forced to return to Iran. Following submission of these exhibits, Youssefinia moved that the judge request a new opinion from the State Department Bureau of Human Rights and Humanitarian Affairs regarding his asylum application. Noting that the matter had been submitted to the State Department three times already, the judge denied the request. Youssefinia argues this was an abuse of discretion. We disagree.

INS regulations mandate that upon receipt of an application for asylum the immigration judge shall request an advisory opinion from the BHRHA. *See* 8 C.F.R. §§ 208.7, 208.10(b) (1985). If an advisory request has already been made by the district director upon receipt of an asylum request, an immigration judge may not make a second request "unless circumstances have changed so substantially since the first opinion was provided that a second referral would materially aid in adjudicating the asylum request." 8 C.F.R. § 208.-10(b) (1985). Where the immigration judge himself has already requested an advisory opinion, the regulations do not require that any additional opinions be requested.

Because the immigration judge requested and received a responsive advisory opinion from BHRHA, *see* n. 2 *supra*, he was not required to make an additional request. In any event, the material submitted by petitioners, while supportive of earlier facts set out in their asylum application, did not evidence any substantial change in their circumstances. The immigration judge did not abuse his discretion in denying the request for a second BHRHA opinion.

### C

The Attorney General has discretion to grant asylum under section 208(a) of the Act, 8 U.S.C. § 1158(a), to an alien who is physically present in the United States if the alien meets the statutory definition of a refugee contained in section 101(a)(42)(A): that he is unable or unwilling to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42)(A).[4] A denial of discretionary relief such as asylum cannot be disturbed on appeal to this court "absent a showing that such action was arbitrary, capricious or an abuse of discretion." *Young v. United States Dept. of Justice, I.N.S.*, 759 F.2d 450, 455 n. 6 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 412, 88 L.Ed.2d 362 (1985). Moreover, the burden is on petitioners to prove their fear of persecution is well-founded. 8 C.F.R. § 208.5.

The immigration judge, in denying the asylum application, held that "the respondent has not demonstrated a well founded fear, reasonable likelihood, or clear probability of persecution in Iran by reason of his race, religion, political opinion, membership in a social group, or ethnic origin and, therefore, has not met his burden of proof of demonstrating eligibility for ... Asylum in the United States...." Petitioners ar-

gue that the immigration judge gave lip service to the well-founded fear standard of review, but abused his discretion by improperly applying the "clear probability" standard pertaining to withholding of deportation applications under section 243(h), 8 U.S.C. § 1253(h).

In *INS v. Stevic*, 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), the Court recently held that an alien is entitled to a withholding of deportation under section 243(h) as a matter of right upon showing a "clear probability" of persecution if returned to his native country. The Court declined to decide the meaning of the "well-founded fear of persecution" standard an alien must meet to obtain asylum under sections 208(a) and 101(a)(42)(A), but suggested that a moderate interpretation of the standard would require a showing that persecution is a "reasonable possibility." 104 S.Ct. at 2498. Since *Stevic* the courts of appeals have diverged on the question of whether the well-founded fear standard is more generous than the clear probability standard. *Compare Sankar v. I.N.S.*, 757 F.2d 532 (3rd Cir.1985) (the well-founded fear standard and the clear probability standard are equivalent) *with Cardoza-Fonseca v. I.N.S.*, 767 F.2d 1448, 1452 (9th Cir.1985), *cert. granted*, —— U.S. ——, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986) (well-founded fear standard has subjective component of genuine fear and objective component that persecution is a reasonable possibility) *and Carvajal-Munoz v. I.N.S.*, 743 F.2d 562, 574 (7th Cir.1984) (well-founded fear standard requires "good reason" to fear persecution or that persecution be a "reasonable possibility," and is not identical to clear probability standard.) On the two occasions when this court has addressed the question, we have found that petitioners failed to demonstrate a well-founded fear of persecution under even the possibly more liberal standard. *See Bah-*

---

**4.** The Attorney General is authorized to delegate his powers under the Act. 8 U.S.C. § 1103. His authority under section 244 of the Act has been delegated by regulation to the Commissioner of the Immigration and Naturalization Service, 8

CFR § 2.1, and in turn to immigration judges, 8 C.F.R. § 242.8(a) (1985), whose decisions are reviewable by the Board of Immigration Appeals, 8 C.F.R. § 242.21 (1985).

*ramnia v. I.N.S.*, 782 F.2d 1243, 1248 (5th Cir.1986); *Young v. United States Dept. of Justice, I.N.S.*, 759 F.2d 450 (5th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 412, 88 L.Ed.2d 362 (1985).

As in prior decisions, we need not reach the question of whether the two standards actually differ, because the immigration judge did not abuse his discretion in denying the asylum application under either standard. Youssefinia's most specific fear of persecution, the result of one letter he wrote many years ago as an informant, depends on the speculative occurrence of a chain of fortuitous events. Even were each of these events to occur so that Youssefinia's former activities became known by the political regime, his father, a full-time informant for Savak, and President of the Shah's political party in Abbassabad, was only briefly incarcerated for activities far more extensive than those of his son. The immigration judge correctly found that petitioner's fear of persecution from this letter incredible and without sufficient foundation.[5]

Youssefinia argues that the immigration judge gave insufficient weight to evidence that his father has been denied all economic opportunities since the revolution, and that his own employment opportunities upon return will be similarly limited. However, economic detriment due to a change in political fortune is alone insufficient to establish a well-founded fear of persecution. *Minwalla v. I.N.S.*, 706 F.2d 831, 835 (8th Cir.1983), *Shoaee v. I.N.S.*, 704 F.2d 1079, 1084 (9th Cir.1983). While Youssefinia argues that a *total* withdrawal of all economic opportunity may support a well-founded fear of persecution, he has not met the burden of proof for such a showing. The record indicates that Youssefinia's brothers have obtained employment and are able to support the family, and the

immigration judge was apparently persuaded that Youssefinia's status upon return would be closer to his brothers' than to his father's. The immigration judge did not abuse his discretion in concluding that whatever loss of economic privileges Youssefinia might experience upon return to Iran did not constitute persecution within the meaning of section 101(a)(42)(A).

**D**

Section 244(a)(1) of the Act, 8 U.S.C. § 1254(a)(1), authorizes the Attorney General in his discretion to suspend the deportation of an otherwise deportable alien who has been physically present in the United States for at least seven continuous years, is of good moral character, and who demonstrates that deportation would result in "extreme hardship" to himself or his United States citizen or permanent resident spouse, parent, or child. It was not disputed in the immigration hearing that Youssefinia met the first two requirements; rather, the immigration judge found that Youssefinia failed to establish that deportation to Iran would cause extreme hardship to himself or his citizen daughter.[6]

As noted by the Court in *I.N.S. v. Wang*, 450 U.S. 139, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981), the meaning of the words "extreme hardship" within the Act is not self-explanatory; however, "the Act commits their definition in the first instance to the Attorney General and his delegates, and their construction and application of this standard should not be overturned by a reviewing court simply because it may prefer another interpretation of the statute." Because the Attorney General and his delegates "have the authority to construe 'extreme hardship' narrowly should they deem it wise to do so," *id.*, our review of whether the facts in this case

---

5. Youssefinia's more generalized fears based upon his membership in the former Shah's political party were also properly found inadequate by the immigration judge due to the millions of other Iranians who also belonged to the party, the fact that Youssefinia held no impor-

tant position within it, and the length of time which has passed since the revolution.

6. Hardship to Youssefinia's wife and son, who were neither United States citizens nor permanent residents, was properly not considered by the immigration judge.

constituted extreme hardship is limited. Absent a complete failure to consider a relevant factor of hardship for which there is evidence, *see Zamora-Garcia v. I.N.S.*, 737 F.2d 488, 493 (5th Cir.1984), our inquiry is only whether the decision of the Attorney General or his delegate was arbitrary, irrational, or contrary to law. *Sanchez v. I.N.S.*, 755 F.2d 1158, 1160 (5th Cir.1985).

■ Petitioners do not point to any specific factor in the record overlooked by the immigration judge. Rather, they argue that with regard to those factors he did consider he was simply wrong in concluding that the economic and social difficulties Youssefinia and his U.S.-born daughter might suffer from being thrust into Iran's current cultural upheaval do not amount to extreme hardship. This conclusion, however, was not arbitrary or capricious. The immigration judge considered each factor raised by petitioners, and we are without authority to second-guess his conclusions as affirmed by the BIA by substituting our own judgment. We uphold their decision.

AFFIRMED.